# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JACKIE WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:01-CV-1223 CAS |
| | ) | |
| GARY B. KEMPER, et al.,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. For the following reasons, the Court will grant in part and deny in part the defendants' motion for summary judgment and will deny plaintiff Jackie Walker's motion for summary judgment. This matter is set for trial on July 11, 2005.

## I. Background.

This is an action pursuant to 42 U.S.C. § 1983 seeking monetary, declaratory and injunctive relief for the alleged violation of plaintiff Jackie Walker's rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Section 21 of the Missouri Constitution. Plaintiff, who is currently an inmate at Western Missouri Correctional Center, asserts that the defendant prison officials targeted him for non-random urinalysis testing while he was incarcerated at the Missouri Eastern Correctional Center, as a means of enforcing institutional rules against inmate use of illegal substances.

---

[1]On the Court's own motion, the Clerk of the Court will be ordered to change the caption of this case to reflect the caption shown on the First Amended Complaint: <u>Jackie Walker v. Gary B. Kemper, Dora Schriro, I. Grimes, Bonita Morrow, Gene Stubblefield, Cameron Daniels, Joe Sampson, Joe Carter, Mark Cain, and Michael Blandford, defendants</u>.

The defendants are Dora Schriro, former Director of the Missouri Department of Corrections and Human Resources (the "MDOC"); Gary B. Kempker, current Director of the MDOC;[2] Ercell Grimes, Inspector General of the MDOC;[3] Bonita Morrow, compliance unit officer for the MDOC; Gene Stubblefield, superintendent of the Missouri Eastern Correctional Center ("MECC"); Cameron Daniels and Joe Sampson, functional unit managers at MECC; and Mark Cain, Joe Carter and Michael Blandford, urinalysis and/or field officers at MECC.[4]

In Count I of the First Amended Complaint, titled "Due Process," plaintiff contends that the institutional urinalysis policy created and implemented by defendants Schriro, Kempker, Grimes and Morrow is unconstitutional because it permits target testing of inmates for narcotics, and the selection criteria for selecting inmates to target test are overbroad, vague and arbitrary and leave too much discretion to corrections officers, resulting in inmate harassment. Plaintiff asserts that Stubblefield, Daniels, Sampson, Cain, Carter and Blandford denied him his due process rights through their implementation and practice of target testing under the urinalysis policy. Plaintiff also asserts that the defendants harassed and retaliated against him for his complaints about target testing and for filing the instant lawsuit. Plaintiff seeks a declaration that the Offender Urinalysis Testing Policy (the "Policy") is unconstitutional, and that defendants' failure to adhere to the provisions of the Policy is also unconstitutional. Plaintiff also seeks compensatory and punitive damages and attorney's fees.

[2]This defendant was sued as "Gary B. Kemper."

[3]This defendant was sued as "I. Grimes."

[4]Plaintiff's claims against defendant Michael Blandford were voluntarily dismissed with prejudice on November 17, 2004. See Doc. 111.

In Count II, titled "Fourth Amendment–Unreasonable Search and Seizure," plaintiff again alleges that the Policy is unconstitutional. Plaintiff also alleges that Stubblefield, Daniels, Sampson, Cain, Carter and Blandford failed to follow the mandates of the Policy for selecting offenders for monthly target testing. Plaintiff alleges that these defendants have violated his Fourth Amendment right to be free from unreasonable searches and seizures by harassing him and subjecting him to repeated testing as a form of retaliation. Plaintiff also alleges that the urine testing occurred in non-private areas where he would be viewed by other inmates and MECC personnel, including women. Plaintiff seeks a declaration that the Policy is unconstitutional, and that defendants' failure to adhere to the provisions of the Policy is unconstitutional. Plaintiff also seeks compensatory and punitive damages and attorney's fees.

In Count III, titled "Eighth Amendment–Cruel and Unusual Punishment," plaintiff alleges that during the course of urinalysis testing, the defendants routinely denied him access to water, to facilities to wash his face and brush his teeth, and to use the toilet for purposes of making a bowel movement. Plaintiff alleges that on one occasion during testing conducted by defendant Cain, plaintiff was forced to defecate on himself. Plaintiff alleges that Blandford subjected plaintiff to cruel and unusual punishment by subjecting him to sanction after Blandford deprived plaintiff of the mandatory two-hour period in which to provide a urine sample and the twelve ounces of water to drink which plaintiff is entitled to under the Policy.

## II. <u>Legal Standard</u>.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the

information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

## III. <u>Facts</u>.[5]

At all relevant times from 1998 through 2003, Walker was an offender in the custody of the MDOC. Until the Fall of 2003, he was confined under sentence in the custody of the MDOC at the Missouri Eastern Correctional Center in Pacific, Missouri. In the Fall of 2003, Walker was transferred to Crossroads Correctional Center in Cameron, Missouri. In 2004, Walker was transferred to Western Missouri Correctional Center in Cameron, Missouri.

On December 11, 2001, Walker (along with several other plaintiffs who are no longer parties to this action) filed suit against the defendants. Walker filed an Amended Complaint on June 19, 2003, through appointed counsel.

**The Drug Policy**

The MDOC adopted the D5-7.1 Urinalysis Policy (the "Policy") effective March 1, 1998. The MDOC Department Director at that time, Dora Schriro, signed the Policy. The purpose of the Policy, which was applicable to all divisions of the MDOC, was to provide guidelines for collecting, identifying, transporting, storing and testing urine samples for drugs, and to provide guidelines for the reporting and utilization of test results.

Pursuant to Section II.D. of the Policy, the "drug test coordinator" was "[a]n employee designated by the superintendent or district office administrator to direct and monitor all necessary

---

[5]Because the parties have filed cross-motions for summary judgment, there are two statements of uncontroverted material facts before the Court, together with each side's responses. The Court will adopt in large part the statement of material facts submitted by plaintiff and not controverted by the defendants.

duties related to the collection, labeling, control, documentation and transportation procedures for offender drug testing." According to Section II.E of the Policy, "drug testing" was the "analytical testing of a urine sample for the purpose of detecting the presence of illicit or unauthorized substances."

Under Section II.F. of the Policy, an "offender" was "[a]ny individual under institutional or field supervision of the department of corrections." Pursuant to Section III.A. of the Policy, offenders could be required to submit a urine sample for drug testing by the department or a contracted vendor. Under Section III.A of the Policy, offenders could be selected at random, or by targeting, to submit a urine specimen for drug testing. The Policy required that each institution randomly test 12% of its population each month. Id. at Section III.D.1. Under Section III.E.1.a. of the Policy, each institution would "target test 10% of the offender population each month." Id.

Requests for target testing, according to Section III.E.1.a. of the Policy, could be made by any staff member by making their request through the drug test coordinator. Id. Under Section III.E.1.c of the Policy, target testing was required on offenders who were to be released on parole, offenders who were being transferred to a reduced custody level institution and offenders in housing areas where drug interdiction team dogs had alerted their handlers to the location of a potential illegal substance. Id.

Section III.E.1.d of the Policy delineated the following additional reasons which could be utilized for conducting target testing until the 10% quota had been reached:

   a.   offenders found in possession of drugs;
   b.   offenders occupying an area where drugs or drug paraphernalia were found;
   c.   offenders refusing searches or who run from staff when ordered to submit to search;
   d.   reliable information provided to staff;

     e.       offenders returning from visits, work release, outcounts, court, work details, furloughs, etc.;

     f.       known drug user who has previous positive test results; and

     g.      behavior which is indicative of possible drug use.

Id.

The Policy did not require institutions to keep any documentation regarding who requested that an inmate be targeted for an urinalysis test. See Stubblefield Dep. at 80-81. The Policy did not require that institutions keep any documentation regarding the reason why an inmate was targeted for a urinalysis test. Id.

MECC sends all its inmate urine specimens to be tested to the toxicology lab at Cremer Therapeutic Community Center ("Cremer"). The toxicology lab at Cremer uses the EMIT II DAU Reagent screen methods to conduct drug screening of urine samples. When an inmate's urine specimen tests positive for prohibited drugs, Cremer runs a second test to confirm the results.

**The 2002 Drug Policy**

The MDOC adopted the D5-7.1 Urinalysis Policy effective February 11, 2002. The MDOC Department Director at that time, Gary Kempker, signed the policy. From February 11, 2002 until at least the fall 2003, the revised Policy applied to all divisions of the MDOC. Id. at Section I.B.

The purpose of the revised Policy per Section III. thereof was substantively the same as the purpose of the earlier Policy. See supra. Under Section II.N. of the revised Policy, target testing was defined as "[u]rinalysis testing performed on an offender as identified within this procedure." According to Section III.A.(5) and (6) of the revised Policy, offenders could be tested at random, or by target testing.

Like before, pursuant to Section III.A.6.a.(1) of the revised Policy, there was a 10% quota on the number of monthly target tests. Under Section III.A.6.a.(3) and (4) of the revised Policy, target testing was required on certain categories of offenders. Section III.A.6.a.(5) of the revised Policy delineated specific reasons (with some revision) which could be utilized to reach the 10% target testing goal:

a. offenders found in possession of drugs;
b. offenders occupying an area where drugs or drug paraphernalia were found;
c. offenders refusing to comply when ordered to submit to search;
d. reliable information provided to staff or other reasonable suspicion exists;
e. offenders returning from visits, work release, outcounts, court, work details, extended limits of confinement, etc.;
f. known drug user who has previous positive test results; and
g. behavior which is indicative of possible drug use, and
h. offenders who have been convicted of a drug related offense.

Sergeant Harry Burleigh testified that if he did not meet the 10% quota for target tests, that "I'd get yelled at, asked how come we didn't get all of them." Burleigh Dep. at 65-66. Defendant Cain, a urinalysis officer at MECC from January until July 2001, testified that if he did not meet the 10% quota he "would have been replaced." Cain Dep. at 10, 82-83.

The revised Policy still did not require that institutions keep any documentation regarding who requested that an inmate be targeted for a urinalysis test, or the reasons why he was being targeted. Stubblefield Dep. at 65, 80-81. Pursuant to the revised Policy, each month an institution's drug test coordinator was required to submit a drug test follow-up report (hereinafter "Monthly Report") to various supervisors, including the institution's superintendent. Exhibit D, at § III.N.2. and Exhibit F, at § III.K.2.

The Monthly Report was required to contain the following information:

a.   The names and numbers of all offenders targeted for drug testing and the positive/negative results; and

b.   the names and numbers of all offenders who have received a conduct violation for use or possession of unauthorized substances.

### Separate Occurrences of Target Testing

In October 1999, Walker submitted a specimen for a urinalysis test following a target request, which tested positive for the presence of drugs. <u>See</u> Oct. 1999 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in October 1999 or the reason why someone requested that Walker be targeted for a urinalysis test in October 1999.

In November 1999, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. <u>See</u> Nov. 1999 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in November 1999 or the reason why someone requested that Walker be targeted for a urinalysis test in November 1999.

In February 2000, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. <u>See</u> Feb. 2000 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in February 2000 or the reason why someone requested that Walker be targeted for a urinalysis test in February 2000.

In April 2000, Walker submitted a specimen for a urinalysis test following a target request, which tested positive for the presence of drugs. <u>See</u> Apr. 2000 Monthly Report. The defendants do

not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in April 2000 or the reason why someone requested that Walker be targeted for a urinalysis test in April 2000.

Defendant Stubblefield, the MECC Superintendent, testified that on or before April 2000, an officer's request to target test offenders had to be in writing if it was to be in compliance with the MDOC's and MECC's urinalysis policies, procedures and protocols in effect at that time. Stubblefield Second Dep. at 191-92.

Harry Burleigh, MECC's urinalysis coordinator from 1988 until 2002, testified that pursuant to the urinalysis policies in effect while he was the urinalysis coordinator, he required MECC staff members who wanted to request a target test of an inmate to put their request in writing before he would consider the request. Burleigh Dep. at 90-94.

In May 2000, Walker submitted a specimen for a urinalysis test following a target request. See May 2000 Monthly Report. (The result of this test is not included in plaintiff's factual statement or in the exhibits attached thereto.) The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in May 2000 or the reason why someone requested that Walker should be targeted for a urinalysis test in May 2000.

In July 2000, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. See July 2000 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in July 2000 or the reason why someone requested that Walker be targeted for a urinalysis test in July 2000.

In August 2000, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. See Aug. 2000 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in August 2000 or the reason why someone requested that Walker be targeted for a urinalysis test in August 2000.

In February 2001, Walker submitted a specimen for a urinalysis test following a target request, which tested positive for the presence of drugs. See Feb. 2001 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in February 2001 or why someone requested that Walker be targeted for a urinalysis test in February 2001.

On June 12, 2001, the Assistant Superintendent at MECC, Dale Glass, issued a memo mandating that all target requests by staff members be in writing. Glass stated in the memo that written documentation "will assist us when answering offenders' claims of retaliation or harassment." Glass' 2001 memo also stated that "[t]he drug test coordinator will keep the written request [for an offender to be targeted for a urine test] on file with lists of names of offenders tested that date."

Stubblefield testified that the Glass 2001 memo was a re-affirmation of previous policies and procedures at MECC dating as far back as 1997, which directed staff to make their target request in writing. Stubblefield Dep. at 10-11, 117-18.

In June 2001, Walker submitted a specimen for a urinalysis test following a target request, which tested positive for the presence of drugs. See June 2001 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be

targeted for a urinalysis test in June 2001 or the reason why someone requested that Walker be targeted for a urinalysis test in June 2001.

In July 2001, defendant Mark Cain was removed from his position as a drug coordinator at MECC based on his arbitrary target testing of inmates after a verbal altercation with inmates. Stubblefield Dep. at 104; Letter of Caution from Stubblefield to Cain, 7/9/2001; Inter-Office Communication from Captain William Jackson to Glass, 6/29/2001.

In February 2002, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. See Feb. 2002 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in February 2002 or the reason why someone requested that Walker be targeted for a urinalysis test in February 2002.

In October 2002, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. See Oct. 2002 Monthly Report. The defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in October 2002 or the reason why someone requested that Walker be targeted for a urinalysis test in October 2002.

In February 2003, Walker submitted a specimen for a urinalysis test following a target request which did not test positive for the presence of drugs. See Feb. 2003 Monthly Report. The Defendants do not have any personal knowledge or documentary proof concerning who requested that Walker be targeted for a urinalysis test in February 2003 or the reason why someone requested that Walker be targeted for a urinalysis test in February 2003.

The defendants have not produced any evidence, either testimony or documentation, suggesting who made targeted requests for a urine specimen from Walker or reasons why the targets were made during the period from 1999 until 2003. See, e.g., Burleigh Dep. at 62-64.

In 2003, Sergeant Harry Burleigh was removed from his position as drug coordinator after it was learned that he offered to tell an inmate how to circumvent the urinalysis drug test to avoid getting a positive test result, in return for the inmate providing him with information about a MECC staff member. Stubblefield Dep. at 126-27; Letter of caution from Stubblefield to Burleigh, 9/25/2002.

Walker's urine samples were collected in the education annex, which is the urinalysis collection area at MECC. Urine samples were given in bathroom inside the urinalysis collection room in the education annex. Until approximately August 2001, there was no door to the bathroom where the urine samples were given.

**Individual Defendants**

Defendant Schriro was at times relevant herein the Director of the MDOC, and in her individual and official capacity in that position oversaw and approved the implementation and distribution of the 1998 Policy.

Defendant Kempker succeeded Schriro as Director of the MDOC from May 28, 2001 until January 13, 2005. During Kempker's tenure as Director the 2002 revision of the Policy was adopted. Kempker signed the 2002 Policy in his individual and official capacity in that position.

Defendant Grimes was Inspector General of the MDOC from April 1, 1996 until February 28, 2003. His duties included ensuring that MECC's policies, regulations and customs were not in conflict with state and federal law.

Defendant Morrow was at all relevant times the compliance unit officer for the MDOC, and in that position she contributed to the creation and revisions of policies, procedures and regulations for institutions in the MDOC.

Defendant Stubblefield was the superintendent of MECC at all relevant times, from May 1997 until October 2002. Stubblefield supervised and managed the overall operations of MECC. Stubblefield testified that it was preferable for target requests for urinalysis tests to be in writing in order to explain why particular individuals were targeted, and to prevent officers from subjectively choosing their own reasons for testing, or having no reasons at all. Stubblefield Dep. at 82, 84.

Defendant Cameron Daniel has been a functional unit manager ("FUM") at MECC since approximately 1996 or 1997. As a FUM, Daniel has no input into the creation of MDOC policy. Daniel oversees all the staff in his housing unit. His duties include overseeing transfer decisions made by caseworkers in the housing unit and other actions taken by the caseworkers relating to inmate conduct violation hearings. Daniel also review Informal Resolution Requests ("IRRs") submitted by offenders in his housing unit. Daniel never reviewed any IRRs submitted by Walker relating to his complaints concerning urinalysis testing. During a period of time, however, Daniel received complaints from Walker about the manner in which his urine samples were taken.

Defendant Joe Sampson is currently a FUM at Eastern Reception, Diagnostic and Correctional Center in Bonne Terre, Missouri. Sampson was a FUM at MECC from approximately February 2002 until November 2002. As a FUM, both at Eastern and MECC, Sampson was not involved in the drafting of MDOC policy and procedure. Sampson's responsibility is for the overall running of the housing unit to which he is assigned, which includes his review of caseworker paperwork, reviewing IRRs, discussing issues with offenders and making recommendations on

offender conduct violations. Sampson is not responsible for investigating the misconduct of officers assigned to his housing unit. Sampson never reviewed any IRRs submitted by Walker relating to his complaints concerning urinalysis testing.

Defendant Joe Carter was at all relevant times a urinalysis officer or a field officer at MECC.

Defendant Mark Cain is a correctional officer, level II, or sergeant, at Farmington Correctional Center. From 1999 until 2001, Cain worked at MECC. Cain was the urinalysis officer at MECC from approximately January 2001 until July 2001. Cain does not personally know Walker. Walker tested positive for drug use twice while Cain was the urinalysis officer at MECC. Defendant Cameron Daniel was not Cain's supervisor while Cain was the urinalysis officer at MECC.

### Walker's Complaints

Walker wrote a letter to Stubblefield on May 9, 2000, complaining that Stubblefield needed to ensure that the urinalysis officer at the time was not using his position to harass inmates. Walker stated that "[t]here is nothing in place to keep a balance and check on [the urinalysis officer's] tactics in harassment. Many are targeted at [his] own whim…. Selecting people off the yard just because they call him names (albeit, they shouldn't); but this is not 'cause' for testing." He requested Stubblefield to take an objective, unbiased look into these issues and to take corrective action. Walker sent a copy of his May 9, 2000 letter to Grimes.

On August 10, 2001, Walker wrote Stubblefield claiming that officer Cain had harassed him by targeting him unnecessarily.

### Mandatory Sanctions

D5-7.3 is an MDOC policy that delineates sanctions for Offender Substance Abuse. Offenders who have a positive drug test result can be subject to the following sanctions: disciplinary

segregation, activity restriction, deprivation of visitation rights, limited canteen spending, restricted from working in a work release program, and confinement restriction. Walker believes that sanctions for his positive drug tests have negatively affected his opportunity to be paroled.

**IV. <u>Discussion</u>**.

The Court will address defendants' and plaintiff's motions for summary judgment in turn. The defendants move for summary judgment on each count of the First Amended Complaint, and plaintiff moves for summary judgment on Counts I and II.

**A. Count I – Due Process**.

**1. Due Process Challenge to the Urinalysis Policy**.[6]

The defendants move for summary judgment on the basis that plaintiff's Due Process rights were not violated by the Policy, because it is reasonable within the meaning of the Fourth Amendment as it is rationally related to a legitimate penological interest. Plaintiff opposes the motion and moves for summary judgment on this aspect of Count I, arguing that the Policy's non-random urinalysis drug testing is unconstitutional because it gives corrections officers subjective discretion to target inmates.

It is clear that "urinalysis constitutes a search or seizure for purposes of the Fourth Amendment." <u>Spence v. Farrier</u>, 807 F.2d 753, 755 (8th Cir. 1986); <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 617 (1989) (stating that urinalyses "must be deemed searches under the Fourth Amendment"). As a result, the urinalysis must be conducted in a reasonable manner. <u>Skinner</u>, 489 U.S. at 618; <u>Spence</u>, 807 F.2d at 755. The Supreme Court has explained that prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and

---

[6]The Court's discussion of the Policy encompasses both the original D5-7.1 Urinalysis Policy adopted in 1998 and the 2002 revision.

practices that in their judgment as needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979) (internal punctuation omitted). As a result, a reasonableness analysis requires "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates . . . ." Id. at 560.

In this case, the defendants assert that the Policy is valid because it is reasonably related to the legitimate penological interest of keeping illegal drugs out of prison, citing Turner v. Safley, 482 U.S. 78, 89 (1987) (standard of review for prison regulations which impinge on inmates' constitutional rights). The defendants state that the Policy requires a target test of ten percent of the institution's population, and lists specific circumstances under which an offender can be target tested. Defendants contend that targeting certain inmates for drug screening is reasonably related to a legitimate penological interest, citing McDiffett v. Stotts, 902 F. Supp. 1419, 1424-25 (D. Kan. 1995) (upholding a non-random drug test where the inmate had a history of drug abuse and prison officials suspected he had been smoking marijuana two days prior to the test). Defendants also contend that where a large number of inmates are selected for testing each month, such as under the Policy, the danger of harassment is "illusory," citing Thompson v. Souza, 111 F.3d 694, 702 (9th Cir. 1997) (holding that non-random urinalysis tests of 124 inmates, at the same time and under the same conditions, could not constitute harassment of one of the inmates). The defendants also move for summary judgment on this claim based on qualified immunity principles.

Plaintiff responds that the instant case is readily distinguishable from those on which defendants rely. With respect to McDiffett, plaintiff states that the target testing was found reasonable in that case because the plaintiff had a history of drug abuse and was suspected of smoking marijuana in his cell two days prior to the target test. In contrast, plaintiff states that in his case, the

defendants have no idea why he was target tested on twelve separate occasions over a five-year period, in spite of a MECC protocol which requires that the reasons for target testing be put in writing. Thus, plaintiff contends that issues of fact remain as to why he was targeted.

With respect to <u>Thompson</u>, plaintiff states that of 129 inmates whose cells were searched, 124, or 96 percent, were required to submit to non-random urinalysis tests. Plaintiff states that the Tenth Circuit's refusal to accept the proposition that selecting one plaintiff for a urine test could constitute harassment involved a unique set of facts not analogous to this case, given the large percentage of inmates tested in <u>Thompson</u> and the fact that all of the tests occurred at the same time.

In plaintiff's own motion for summary judgment on this claim, plaintiff asserts that federal case law draws a distinction between random prison urinalysis drug testing and non-random testing. Plaintiff states that while random testing of prisoners has consistently been upheld as constitutional under the Fourth Amendment, <u>e.g.</u>, <u>Spence</u>, 807 F.2d 753, courts have held that urinalysis testing programs were unconstitutional where they permit non-random, subjective discretion to target inmates, <u>e.g.</u>, <u>Storms v. Coughlin</u>, 600 F. Supp. 1214, 1224 (S.D.N.Y. 1984).

In <u>Storms</u>, the prison employed a drug testing policy which permitted urinalysis tests to be conducted when the prisoner was actually suspected of drug use, in addition to randomly testing a few prisoners each day who showed no signs of drug use. Under the policy, a watch commander chose the particular prisoners to be "randomly" tested by picking cards with the offender's names on them from a board in his office. The inmates whose cards were picked off the board were ordered to report for urinalysis. The district court found that the challenged urinalysis procedure was unreasonable and unconstitutional because the non-random testing procedure had an inherent potential to be used to harass inmates:

It is important to insure that when the State chooses to employ such intrusive random searches as these the procedures for selecting the inmates to be tested are truly random. The potential for abuse . . . is apparent. So long as he is potentially aware of the name of the prisoner he is choosing, the commander may, consciously or unconsciously, steer his choices toward less favored inmates. Certainly the practice lends itself to abuse, although there may be no conscious abuse. The unjustified potential for abuse in the face of readily available alternatives makes the current procedure unreasonable.

Storms, 600 F. Supp. at 1223.

Plaintiff contends the Policy violates the Fourth Amendment limitation against unreasonable searches and seizures in several ways. First, the Policy mandates that ten percent (10%) of the inmate population be target tested each month. Plaintiff argues that the Policy thereby creates an atmosphere where "arbitrary and capricious decisions to test an inmate are encouraged to fill the quota rather than solely targeting inmates for reasons that the Policy indicates are legitimate." Pl.'s Mem. Supp. Summ. J. at 10.

Second, plaintiff contends the Policy expressly allows field officers to make subjective determinations as to who should be target tested for virtually any reason at all. Prior to June 2001 when Dale Glass issued the memo described above at page 11, there was apparently no requirement that any MECC supervisor review requests for target urinalysis testing to make sure the request was legitimate. Therefore an officer wishing to target a particular inmate simply needed to request that the inmate be target tested, without being required to give or document a reason for the testing.

Third, plaintiff asserts that the enumerated reasons for targeting inmates (listed above at pages 6 and 8) do not constitute appropriate limiting guidelines for selecting inmates to test, because the criteria for target testing are so broad that virtually any inmate could be subjectively targeted. By leaving it up to corrections officers to decide whether reasonable suspicion exists to warrant target

tests, the Policy allowed officers to select targets for reasons not reasonably related to suspected drug use. Plaintiff also notes that the Policy stated the targeting guidelines were "optional," and allowed officers to target test inmates if they provided unspecified "additional reasons" why a urinalysis test should be performed. Thus, plaintiff contends, the Policy gave corrections officers unfettered discretion to order target tests. Plaintiff states that the lack of effective limits on target testing demonstrably led to harassment of inmates, pointing to the demotion of defendant Cain from his position as urinalysis officer for using his discretion to improperly target test and harass inmates.

Prisoners retain many constitutional rights, Bell v. Wolfish, 441 U.S. at 545, Turner, 482 U.S. at 84, but some constitutional rights are necessarily limited due to considerations inherent in a penal system, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). A prison regulation that infringes upon an inmate's retained constitutional rights will be upheld as valid if the regulation is reasonably related to a legitimate penological interest. Turner, 482 U.S. at 89.

As discussed above, urine tests are searches within the meaning of the Fourth Amendment. Spence, 807 F.2d at 755. For Fourth Amendment purposes, urinalysis is analogous to body cavity searches and blood tests. Forbes v. Trigg, 976 F.2d 308, 312 (7th Cir. 1992), cert. denied, 507 U.S. 950 (1993). In Bell v. Wolfish, 441 U.S. 520, the Supreme Court considered the constitutionality of post-visitation inmate body cavity searches, and explained that the basic test for the constitutionality of a search that invades the integrity of an inmate's body is reasonableness:

> In each case [the Fourth Amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Wolfish, 441 U.S. at 559 (citations omitted).  The Supreme Court emphasized that prison officials are afforded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Id. at 547.

The Eighth Circuit and other courts have recognized that "[t]he unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country."  Spence, 807 F.2d at 755.  The Court observed that as a result of the limitations on prisoners' constitutional rights based on the fact of their confinement and the prison's legitimate security needs, "the prisoner's expectation of privacy in his or her body is diminished."  Id.  Accordingly, the Eighth Circuit held that the limited expectation of privacy retained by prisoners is not violated by random urine collection and analysis, and found that urine testing is a reasonable means of combating the problem of narcotics in penal institutions.  Id.  The Court has cautioned, however, that where a state chooses to employ intrusive random searches, "the procedures for selecting the inmates to be tested must be truly random."  Id. (citing Storms, 600 F. Supp. at 1223 ).

Other courts have stated, "Selection procedures are not truly random and thus violate the Fourth Amendment when the procedures leave 'the exercise of discretion as to selected targets in the hands of a field officer with no limiting guidelines.'"  Lucero v. Gunter, 52 F.3d 874, 877 (10th Cir. 1995) (quoting Shoemaker v. Handel, 795 F.3d 1136, 1143 (3rd Cir.), cert. denied, 479 U.S. 986 (1986)); see, e.g., Storms, 600 F. Supp. at 1223, 1224 (enjoining procedure under which prison watch commander was aware of the identity of the inmates to be urinalysis tested while he was choosing them, because the non-random method of selection unnecessarily exposed the inmates to the risk of harassment).

Although plaintiff asserts that target testing is unconstitutional, none of the cases on which plaintiff relies hold that regulations similar to those at issue here are unconstitutional. The primary case on which plaintiff relies, Storms, is factually distinguishable. In that case, the issue was whether a test which was supposed to be administered randomly was in fact random, because the prison official selecting inmates for testing did so by choosing a card bearing their names from a bulletin board, a practice which lent itself consciously or unconsciously to potential harassment. Id., 600 F. Supp. at 1223.

In this case, the target urinalysis testing is not intended to be random. As discussed above in the Facts section, the Policy provides for monthly target testing of ten percent of the inmate population. Target testing was required on offenders who were to be released on parole, offenders who were being transferred to a reduced custody level institution and offenders in housing areas where drug interdiction team dogs had alerted their handlers to the location of a potential illegal substance. The Policy also provides the following additional reasons to select a particular individual for target testing until the ten percent quota had been reached:

a. offenders found in possession of drugs;
b. offenders occupying an area where drugs or drug paraphernalia were found;
c. offenders refusing searches or who run from staff when ordered to submit to search;
d. reliable information provided to staff;
e. offenders returning from visits, work release, outcounts, court, work details, furloughs, etc.;
f. known drug user who has previous positive test results; and
g. behavior which is indicative of possible drug use.

Only one case cited by the parties, McDiffett v. Stotts, 902 F. Supp. 1419 (D. Kan. 1995), addressed the issue of non-random urinalysis under somewhat similar institutional regulations. In McDiffett, the court rejected the prisoner plaintiff's challenge to regulations which identified inmates

to be targeted for urinalysis based on such criteria as a history of drug or alcohol abuse, groups of inmates by living, work or program arrangement where a pattern of drug or alcohol abuse was discovered, inmates chosen randomly, and inmates whose custody or program increased the potential for contact with contraband drugs, including through furloughs, work release, and community work assignments. Id. at 1424. The court in McDiffett concluded the policy's targeting of certain inmates for urinalysis was reasonably related to the legitimate penological interest in monitoring and controlling alcohol and drug use in the prison setting. Id. at 1425.

This Court finds that targeting for urinalysis testing certain inmates who fall within the stated categories of the Policy is reasonably related to a legitimate penological interest. "[T]he duty to keep drugs out of a prison is part of prison administrators' responsibility to maintain a correctional center's institutional security." Romo v. Champion, 46 F.3d 1013, 1017 (10th Cir.), cert. denied, 516 U.S. 947 (1995). In making this finding, the Court is cognizant of the Supreme Court's directive to accord "wide-ranging deference" to prison administrators in the "adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. at 547. Defendants' motion for summary judgment should therefore be granted on plaintiff's Due Process claims in Count I which assert that the Policy is unconstitutional, and plaintiff's motion for summary judgment on this aspect of Count I should be denied. As a result, the Court does not reach the issue of qualified immunity.

## 2. Due Process Challenge to Disciplinary Proceedings.

Defendants also move for summary judgment on plaintiff's claim in Count I that his due process rights were violated at the disciplinary hearings he attended following the receipt of conduct violations for positive drug tests. Defendants assert that the evidence presented at the hearings

relating to plaintiff's drug use was based on the lab test results, which plaintiff was given the opportunity to rebut. Defendants assert that this is sufficient to satisfy due process in the prison context, citing Spence, 807 F.2d at 756.

Plaintiff responds that he was consistently denied an adequate opportunity to present evidence to rebut the findings that he had violated MECC drug policy. Specifically, plaintiff states he was never permitted to review the full lab reports to determine if they had sufficient indicia of reliability, but rather received only a one-page lab cover sheet indicating that he had tested positive for a drug. Plaintiff also states that he was denied the opportunity to review the requests for target urine tests to determine if they complied with the Policy, because defendants have never been able to located any target requests concerning him.

Finally, plaintiff asserts that he was deprived of his liberty interest in the fair and accurate determination of which prisoners would be selected for urinalysis testing, which subjected him to an atypical and significant hardship in relation to the ordinary incidents of prison life. See Sandin v. Conner, 515 U.S. 472, 484 (1995). Plaintiff identifies defendant Stubblefield in particular as having deprived plaintiff of his liberty interest by failing to investigate and respond to plaintiff's complaint that he was being harassed by defendant Cain in his role as urinalysis officer.

In a disciplinary action situation, procedural due process requires that: (1) written notice of the charges be provided to the inmate with at least twenty-four hours to prepare for the hearing; (2) the inmate be provided with a written statement by the factfinders discussing the evidence and reasons supporting the action; and (3) the inmate be afforded the opportunity, so far as safety and security allow, to call witnesses and present documentary evidence. Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974); Tyler v. Black, 811 F.2d 424, 429 (8th Cir. 1987), cert. denied, 490 U.S. 1027 (1989).

The Supreme Court has held that due process is satisfied if a disciplinary board's findings "are supported by some evidence in the record." Superintendent, Mass. Corr. Institution, Walpole v. Hill, 472 U.S. 445, 455-56 (1985); Turner v. Caspari, 38 F.3d 388, 392 (8th Cir.1994). The Eighth Circuit has held that the results of an EMIT test is "sufficiently reliable to meet the requirements of the due process clause." Spence, 807 F.2d at 756.

Defendants' failure to provide plaintiff with a copy of the complete laboratory test results does not constitute a due process violation. See Harrison v. Dahm, 911 F.2d 37, 41 (8th Cir. 1990) (Wolff does not require that inmate be provided with copy of drug test results in the written notice, and prison officials are not required to supply an inmate with a copy of test results at the disciplinary hearing); see also Allen v. Purkett, 5 F.3d 1151, 1153 (8th Cir. 1993) (same), cert. denied, 513 U.S. 829 (1994). The Court also concludes that due process does not require the defendants to provide plaintiff with copies of the target testing requests, as an inmate is only entitled to advance written notice of the alleged disciplinary violation. See Wolff, 418 U.S. at 563; Harrison, 911 F.2d at 41.

With respect to plaintiff's allegations that defendants committed multiple violations of the Policy, there is no federal constitutional liberty interest in having state prison officials follow prison regulations. Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (citing Kennedy v. Blankenship, 100 F.3d 640, 643 (8th Cir.1996)). Plaintiff's allegations in the Complaint that he has various liberty interests created by the terms of the Policy and infringed by defendants' alleged violations of the Policy therefore fail to allege a constitutional claim. See Sandin v. Conner, 515 U.S. 472, 482 (1995) (noting that state prison regulations are "not designed to confer rights on inmates"). Under Sandin, due process if not implicated unless an inmate is subject to punishment which would be considered atypical, or unless the punishment will inevitably affect the duration of a prisoner's sentence.

Therefore, a prisoner can only bring a procedural due process claim if the punishment which the prisoner received as a result of the alleged denial of his due process rights: (1) "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," id. at 484, or (2) affected the duration of the prisoner's sentence, e.g., parole time, or good time credits. If the punishment meets either of these criteria, a court must analyze whether there has been a deprivation of procedural due process under Wolff v. McDonnell, 418 U.S. 539 (1974). In this case, violation of the Policy does not create a liberty interest. Cf. Thompson v. Souza, 111 F.3d at 700 (prisoner plaintiff did not claim that violation of a prison strip search regulation "creates a liberty interest, nor could he make such a claim," citing Sandin).

The punishments plaintiff alleges he received as a result of the alleged denial of due process did not impose atypical or significant hardships on him in relation to the ordinary incidents of prison life. Plaintiff alleges he was denied visitation, recreation rights, canteen spending rights, and was placed in administrative segregation. Complaint, ¶ 49. None of these punishments constitutes an atypical or significant hardship in relation to ordinary prison life. See, e.g., Phillips, 320 F.3d at 847 (denial of exercise for 37 days was not an atypical and significant hardship); Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002) ("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin."); Ware v. Morrison, 276 F.3d 385, 387 (8th Cir. 2002) (loss of visitation not atypical or significant); Kennedy, 100 F.3d at 642 n.2, 643 (placement in punitive isolation was not atypical and significant deprivation even though prisoner faced restrictions in mail, telephone, visitation, commissary, and personal-possession privileges).

Plaintiff also alleges that the punishments have affected his ability to obtain a parole hearing and have delayed his release date. Complaint, ¶ 50. In order to determine whether this may be an

atypical or significant hardship, the Court must look to Missouri law to determine whether plaintiff has a liberty interest in parole created by a mandatory scheme which necessarily affects the duration of a prisoner's sentence. Moorman v. Thalacker, 83 F.3d 970, 973 (8th Cir. 1996) (citing Sandin, 515 U.S. at 477). Missouri's parole statute, Missouri Revised Statutes § 217.690 (2000), does not create a protected liberty interest in parole, as parole is left entirely up to the discretion of the Board of Probation and Parole even where the prisoner has fulfilled all statutory and regulatory requirements. See Mo. Rev. Stat. § 217.690.1 (the Board "may in its discretion" parole an inmate upon belief there is reasonable probability that he can be released without detriment to the community or to himself); Ingrassia v. Purkett, 985 F.2d 987, 988 (8th Cir.1993) (under Missouri's parole statute, parole is purely discretionary); Maggard v. Wyrick, 800 F.2d 195, 198 (8th Cir.1986) (the Missouri parole statute "does not create a protected liberty interest in parole").

Plaintiff also alleges that defendants violated his due process rights by keeping him in administrative segregation for more than the ten days allowed by Mo. Rev. Stat. § 217.380. Complaint, ¶ 48. Violations of state laws do not by themselves state a claim under 42 U.S.C. § 1983. Ebmeier v. Stump, 70 F.3d 1012, 1013 (8th Cir. 1995). Moreover, the Court has previously determined that plaintiff's placement in administrative segregation does not constitute atypical or significant hardship under Sandin. Defendants' motion for summary judgment should therefore be granted on plaintiff's claims relating to the imposition of discipline as a result of the target testing.

### 3. Retaliation.

Plaintiff also alleges in Count I that defendants violated his Due Process rights by harassing and retaliating against him for lodging complaints about drug policy violations and for filing the

instant lawsuit.[7]  The defendants did not address plaintiff's claim of retaliation in their motion for summary judgment or in their Statement of Uncontroverted Facts, but at the end of their motion ask for summary judgment based on qualified immunity on all of plaintiff's claims.  The Court therefore will treat this aspect of defendants' motion for summary judgment as akin to a motion to dismiss.  <u>See</u> <u>Kohl v. Casson</u>, 5 F.3d 1141, 1147 n.1 (8th Cir. 1993) (when the facts presented in a complaint even when accepted as true clearly give rise to an immunity defense, the claim should be dismissed under Rule 12(b)(6)).

The Court must employ a two-part inquiry to determine whether plaintiff's suit can proceed in the face of the assertion of qualified immunity.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). The inquiry must be undertaken in the "proper sequence."  <u>Saucier</u>, 533 U.S. at 200.  First, the Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right."  <u>Id.</u> at 201.  The "existence or nonexistence of a constitutional right" is a threshold question.  <u>Id.</u>

If the answer to the first inquiry is no, the defendant is entitled to qualified immunity and the suit must be dismissed.  <u>See id.</u>  If a constitutional right may have been violated, however, the second step requires the Court "to ask whether the right was clearly established."  <u>Id.</u>  This is a fact-intensive inquiry and "must be undertaken in light of the specific context of the case, not as a broad general proposition."  <u>Id.</u>  <u>Davis v. Hall</u>, 375 F.3d 703, 712 (8th Cir. 2004) (emphasis added).

---

[7]It is not clear to the Court which of the defendants plaintiff alleges harassed and retaliated against him.  <u>See</u> Complaint, ¶ 51.  The Court is confident, however, that these allegations are not directed at the defendants alleged to have been policymakers, specifically defendants Schriro, Kempker, Grimes and Morrow.  Because the defendants did not move for summary judgment on this claim, the Court will assume for purposes of this memorandum and order that this claim is asserted against defendants Stubblefield, Daniels, Sampson, Cain and Carter.

The Court concludes that the facts alleged, when taken in the light most favorable to plaintiff, show that defendants violated his right to be free from retaliation when they targeted him for urinalysis testing because of his complaints concerning the Policy and his filing of this lawsuit. An act taken in retaliation for the exercise of a constitutionally-protected right under § 1983 is actionable even if the act, when taken for a different reason, would not have been actionable. Williams v. Department of Corrections, 208 F.3d 681, 681 (8th Cir. 2000). Thus, plaintiff's assertion that he was retaliated against for complaining about the Policy and filing the instant lawsuit alleges a constitutional violation actionable under Section 1983.

The Court also concludes this right was clearly established, based on Eighth Circuit precedent which holds that prison officials may violate a prisoner's constitutional rights by imposing disciplinary sanctions in retaliation for the prisoner's prior exercise of his constitutional rights. See, e.g., Williams, id. (inmate stated retaliation claim against correctional officers by alleging they placed leg irons too tightly on him because of their displeasure with his participation in a trial); Goff v. Burton, 7 F.3d 734, 736-37 (8th Cir. 1993) (prison officials may not transfer an inmate to another institution in retaliation for inmate's filing of legal actions), cert. denied, 512 U.S. 1209 (1994); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing of a disciplinary charge against a prisoner in retaliation for his having filed a grievance pursuant to established procedures is actionable under § 1983).

Therefore, qualified immunity does not apply. In addition, plaintiff seeks injunctive relief in Count I. Qualified immunity "cannot serve as a defense to an equitable claim such as [a] claim for injunctive relief." Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995). Finally, to the extent defendants Stubblefield, Daniels and Sampson assert that plaintiff has failed to allege their personal

involvement in the alleged constitutional violations in Count I, the Court disagrees. Defendants' motion for summary judgment on plaintiff's retaliation claim based on qualified immunity should therefore be denied, and this claim remains pending.

**B.  Count II – Fourth Amendment**.

The defendants move for summary judgment on Count II of plaintiff's Complaint, which asserts the following claims under the Fourth Amendment:  (1) the target testing provisions of the Policy are unconstitutional because they give officials unfettered discretion and establish a quota for target testing; (2) the Policy is unconstitutional as applied to plaintiff because he was repeatedly target tested although defendants are unable to produce evidence of any legitimate grounds for requesting that plaintiff be target tested; and (3) the urinalysis testing procedures were conducted in such a manner that they constituted an invasion of plaintiff's constitutional right to privacy.

**1.  Constitutionality of Policy**.

The Court's conclusion in Section A., supra, that the Policy survives constitutional scrutiny forecloses plaintiff's first claim.  Defendants' motion for summary judgment should therefore be granted and plaintiff's motion for summary judgment denied with respect to the constitutionality of the Policy.  Although it is not entirely clear from the Complaint, the Court interprets plaintiff's first Fourth Amendment claim as having been asserted against the policymaking defendants, Schriro, Kempker, Grimes and Morrow.

**2.  Unconstitutional Application of Policy**.

The conclusion that the Policy is constitutional does not foreclose the possibility that a prison regulation which meets constitutional requirements could be applied in an unconstitutional manner. That is the issue to be addressed with respect to plaintiff's second claim in Count II.  Plaintiff alleges

that defendants abused their discretion under the Policy to repeatedly select him for target testing. Complaint, ¶¶ 38-39, 54-55. The Court interprets this claim as being asserted against defendants Stubblefield, Daniels, Sampson, Cain and Carter.

The defendants move for summary judgment on plaintiff's claim that he was unfairly targeted for testing. Defendants assert there is no evidence that Cain improperly targeted and harassed plaintiff, and cite Cain's testimony that he did not remember plaintiff. Defendants also cite plaintiff's admissions that he has used drugs while in prison, including at MECC, that he has participated in substance abuse classes including Narcotics Anonymous, and that on at least two occasions he had used drugs when he tested positive at MECC. Defendants contend that these admission indicate it was reasonable to suspect that plaintiff had used illegal drugs while at MECC, and therefore target testing was appropriate.

Plaintiff counters that there has been no evidence presented as to who selected him for target testing or why on the twelve occasions he was targeted for urinalysis testing, although MECC protocol dictates that staff members document requests for target testing. Plaintiff moves for summary judgment on this claim, asserting that defendants cannot offer a shred of proof that he was testing for a permissible reason, as no written requests to target him have been produced. Plaintiff contends that as a result, defendants "are unable to shift the burden of production back to Plaintiff that these particular target tests were done in an effort to harass and retaliate against him." Mem. Supp. Pl.'s Mot. Summ. J. at 13.

Considering the evidence in the light most favorable to plaintiff, the Court concludes the evidence raises a triable issue of fact as to whether the twelve target urinalysis tests conducted on plaintiff were done for a possibly illegitimate purpose such as harassment or retaliation. Therefore,

summary judgment on this issue is inappropriate. Plaintiff's motion for summary judgment should also be denied, because issues of fact remain as to why plaintiff was targeted.

Because the Court will deny defendants' motion for summary judgment on this claim, it must determine whether their alternative motion for summary judgment based on qualified immunity should be granted.

The Court concludes that the facts alleged, when taken in the light most favorable to plaintiff, show that defendants violated his Fourth Amendment right to be free from unreasonable searches. The Court also concludes this right was clearly established, based on precedent from the Supreme Court and this circuit which holds that "urinalysis constitutes a search or seizure for purposes of the Fourth Amendment." Spence, 807 F.2d at 755; see Skinner v. Railway Labor Executives' Ass'n, 489 U.S. at 617 (stating that urinalyses "must be deemed searches under the Fourth Amendment"). As a result, the urinalysis must be conducted in a reasonable manner. Skinner, 489 U.S. at 618; Spence, 807 F.2d at 755. Therefore, qualified immunity does not apply. In addition, plaintiff also seeks injunctive relief in Count II. Qualified immunity "cannot serve as a defense to an equitable claim such as [a] claim for injunctive relief." Williams, 49 F.3d at 445.

### 3. Violation of Privacy Rights.

The defendants did not move for summary judgment on the merits on the third of plaintiff's Fourth Amendment claims in Count II, that the urinalysis testing procedures were conducted in such a manner that they constituted an invasion of plaintiff's constitutional right to privacy.[8] Plaintiff's

---

[8]Defendants attempt to address the privacy claim in their reply memorandum in support of the motion for summary judgment, presumably in response to plaintiff's statement in the memorandum in opposition that the privacy claim had not been addressed. Defendants cannot raise a new issue for summary judgment in their reply memorandum, as this fails to give plaintiff the opportunity to respond to it. See Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., __ F.3d

motion for summary judgment also did not address this claim. As a result, this claim would necessarily remain for trial, except that defendants moved for summary judgment on all aspects of plaintiff's Complaint based on qualified immunity.

Plaintiff alleges in the Complaint that prisoners are required to be nude or semi-nude during urinalysis testing, and that the testing was "at all relevant times conducted in non-private areas where Plaintiff could be viewed by other inmates and MECC instructors, including members of the opposite sex, while undressed." Complaint, ¶¶ 57-58. Defendants allege in their Statement of Uncontroverted Facts and plaintiff admits that urine samples were given in a bathroom inside the urinalysis collection room in the MECC education annex. See Pl.'s Resp. to Defs.' Statement of Uncontroverted Facts, ¶¶ 50-51. Plaintiff appears to admit that there was a door to the urinalysis collection room itself, but denies that there was a door on the bathroom until approximately August 2001. Id., ¶ 52.

As discussed above, in considering qualified immunity the Court must first consider whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. The "existence or nonexistence of a constitutional right" is a threshold question. Id.

The Eighth Circuit has never directly held that a prisoner retains a constitution right to bodily privacy. See Timm v. Gunter, 917 F.2d 1093, 1098 n.4 (8th Cir. 1990) (assuming but declining to decide if inmates possess constitutional right to privacy); Goff v. Nix, 803 F.2d 358, 363 (8th Cir. 1986) (same). In light of circuit precedent, the Court cannot say that it was a violation of any Fourth

---

__, Nos. 04-2035/2180, slip op. at 16 n.5 (8th Cir. May 13, 2005) ("This Court does not consider issues first raised in a reply brief unless the appellant gives some reason for failing to raise and brief the issue in his opening brief. Martin v. Am. Airlines, Inc., 390 F.3d 601, 608 n.4 (8th Cir. 2004)."). The same problem arises when defendants fail to address the merits of a claim but then seek summary judgment on the claim based on qualified immunity.

Amendment privacy right which plaintiff may retain for plaintiff to have been observed giving a urine specimen by other inmates or MECC instructors, including members of the opposite sex. See, e.g., Hill v. McKinley, 311 F.3d 899, 903-05 (8th Cir. 2002) (defendants entitled to qualified immunity on female arrestee's Fourth Amendment privacy claims based on male guard requiring plaintiff to disrobe, plaintiff being escorted naked by male and female guards, and plaintiff being secured to a restrainer board naked and spread-eagled in the presence of male officers for several hours); Timm, 917 F.2d at 1101-02 (opposite-sex pat searches and monitoring of naked prisoners not violative of Fourth Amendment); Franklin v. Lockhart, 883 F.2d 654, 656-57 (8th Cir. 1989) (visual body cavity searches conducted in view of other prisoners upheld absent substantial evidence that it was an exaggerated response to security concerns); see also Parker v. Toelke, 980 F.2d 735 (8th Cir. 1992) (Table) (unpublished per curiam) (prisoner did not have clearly established Fourth Amendment right in not being seen nude by female prison guards, female inmates, or female police officers while showing or using the toilet; defendant entitled to qualified immunity). The Eighth Circuit has observed that it and other courts have held "that prisoners have no general right not to be seen naked by guards of the opposite sex." Hill, 311 F.3d at 904-05 (citing cases). See also Lee v. Downs, 641 F.2d 1117, 1120-21 (4th Cir. 1981) (upholding search of inmate's vagina by a female nurse in the presence of two male guards).

Because the Court has answered the first inquiry in the negative, the defendants are entitled to qualified immunity on plaintiff's privacy claim, which be dismissed. See Saucier, 533 U.S. at 201. Plaintiff's request for injunctive relief on his privacy claim must also be dismissed, because plaintiff has not alleged the violation of a constitutional right. This aspect of defendants' summary judgment motion should therefore be granted.

### C. Count III – Eighth Amendment.

Defendants move for summary judgment on plaintiff's claims in Count III that he was subjected to cruel and unusual punishment in violation of his Eighth Amendment rights, when during the course of urinalysis testing he was denied access to water, to facilities to wash his face and brush his teeth, and to use a toilet for purposes of making a bowel movement before giving his urine specimen. Complaint, ¶ 62. Plaintiff's Complaint alleges that on one occasion during testing by defendant Cain, he was forced to defecate on himself. Id., ¶ 63. Plaintiff also alleges that he was subjected to cruel and unusual punishment when he was deprived of the two-hour period called for by the Policy to produce a urine sample, and of the twelve ounces of drinking water also called for by the Policy.

Defendants assert that plaintiff's Eighth Amendment claims fail to rise to the level of cruel and unusual punishment, because plaintiff neither faced conditions posing a substantial risk of serious harm, nor can he show that defendants were deliberately indifferent to his health and safety. Plaintiff responds that defendants violated his Eighth Amendment rights by creating urinalysis testing conditions that posed an objectively serious safety risk to him. Specifically, plaintiff argues that defendant Cain denied him the "fundamental right to defecate and otherwise perform basic sanitary functions," and notes that Cain's refusal to allow him to defecate contravened the Policy then in effect.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on those persons who have been convicted of crimes. Wilson v. Seiter, 501 U.S. 294, 297 (1991). To prevail on an Eighth Amendment claim, a plaintiff must establish two elements: "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994)

(quoting Wilson, 501 U.S. at 298). The second element arises from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. Id. The Eighth Circuit has instructed that to establish an Eighth Amendment violation, "a plaintiff must show a serious deprivation of 'the minimal civilized measure of life's necessities' and 'offending conduct [that is] wanton.'" Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (quoting Wilson, 501 U.S. at 298, 302).

In evaluating this aspect of defendants' motion for summary judgment, the Court notes that neither party addressed the facts relevant to the Eighth Amendment claim in the statements of uncontroverted material facts. The defendants appear to accept as true the factual allegations in the Complaint for purposes of their motion for summary judgment, and the Court will do so as well.

Accepting all of plaintiff's pleaded facts as true, the Court finds that defendants are entitled to judgment as a matter of law on plaintiff's Eighth Amendment claims. As stated above, plaintiff claims that he was denied access to water and was not allowed to wash his face or hands prior to being asked to give a urine sample, was once forced to defecate on himself, and was not provided with adequate time or drinking water to produce a urine specimen.

Plaintiff has failed to establish that he suffered a sufficiently serious deprivation of the "minimal civilized measure of life's necessities." See Wilson, 501 U.S. at 298. Prisoners have Eighth Amendment rights to "adequate food, clothing, shelter and medical care," Farmer, 511 U.S. at 832. The Constitution "does not mandate comfortable prisons" but rather prohibits "inhumane ones." Id. The hardships which plaintiff alleges, while unpleasant, were temporary and not of sufficient severity to implicate the Eighth Amendment. See Cunningham v. Eyman, 17 Fed.Appx. 449 (7th Cir. 2001) (unpublished per curiam) (prisoner failed to establish a sufficiently serious constitutional violation

under the Eighth Amendment where he was placed in shackles for 16 hours, prison officials refused to remove the shackles so he could use the toilet, and prisoner urinated and defecated on himself); see also Key, 176 F.3d at 1086 (prisoner who was restrained in handcuffs and shackles for 24 hours, making it more difficult to relieve himself and causing him to urinate upon himself, did not suffer a constitutional violation); Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1998) (no Eighth Amendment violation occurred where plaintiff was temporarily deprived of hygiene supplies, where he was without toilet paper for five days and had no soap, toothpaste or toothbrush for ten days). The conditions and hardships plaintiff alleges he suffered were not as severe as those in the foregoing cases.

Plaintiff's situation is also readily distinguishable from cases in which courts found that question of fact existed as to whether an Eighth Amendment violation had occurred. In these cases, the prisoner was subjected to longer periods of deprivation and more severe hardships. See, e.g., Williams v. Benjamin, 77 F.3d 756, 764 (4th Cir. 1996) (fact question existed as to whether Eighth Amendment violated where prisoner was placed in four-point restraints for eight hours, officers refused to permit him to wash his eyes, face and body to remove mace he had been sprayed with, and refused to allow him to use a toilet); Young v. Quinlan, 960 F.2d 351, 363-64 (3rd Cir. 1992) (summary judgment for defendants improper where HIV-positive inmate was kept in "dry" cell for four days, was allowed to leave cell to urinate or defecate only once; was not allowed drinking water, to wash his hands before eating, or to shower, and was not given toilet paper despite his diarrhea).

Defendants' refusal to permit plaintiff to wash his face or hands prior to giving a urine sample does not rise to the level of a constitutional violation. The defendants' failure to permit plaintiff to have twelve ounces of water and two hours in which to give a urine sample similarly does not

constitute deprivation of the "minimal civilized measure of life's necessities." Plaintiff's most serious assertion is that he was once was required to defecate on himself when defendant Cain would not allow him to use the toilet during urine testing. This situation, while unpleasant, is only alleged to have occurred once, and there is no factual allegation as to how long plaintiff was kept from using the toilet. The Court concludes that this allegation fails to establish that plaintiff suffered a sufficiently serious deprivation of constitutional proportions. As a result, the Court need not consider whether the defendants acted with a culpable mental state, i.e., whether they acted with deliberate indifference to a know risk to plaintiff's health or safety. Defendants' motion for summary judgment should therefore be granted on plaintiff's Eighth Amendment claim in Count III. As a result, the Court does not reach the issue of qualified immunity.

### D. Damages for Emotional Distress.

Finally, defendants move for summary judgment on plaintiff's claims for damages arising from emotional distress, citing 42 U.S.C. § 1997e(e). Under this statute, no federal civil action may be brought by a prisoner for emotional injury without a prior showing of physical injury. Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004) (§ 1997e(e) applies to all prisoner federal civil actions, including those brought under the First Amendment), pet. for cert. filed, 73 U.S.L.W. 3623 (Jan. 13. 2005) (No. 04-1348). Plaintiff concedes that he has not alleged any physical injury in his petition, and thus cannot recover damages for his emotional distress. Defendants' motion for summary judgment on plaintiff's claim for emotional distress damages should therefore be granted. As a result, the Court does not reach the issue of qualified immunity.

### E. Violation of Missouri Constitution.

Plaintiff may also be asserting a claim that the defendants violated his rights under Article. I, Section 21 of the Missouri Constitution.[9] The Complaint states in part, "Defendants' actions and/or omissions violated Plaintiff's rights to the protections guaranteed by . . . Article I, § 21 and the Missouri Constitution," id., ¶ 9, and the prayer of each count seeks a declaration that the Policy is illegal under, inter alia, the Missouri Constitution. It is unclear whether plaintiff asserts that this alleged constitutional violation subjects defendants to liability under § 1983, or whether this is a supplemental state law claim.

To the extent this claim may be characterized as one under Section 1983, it must fail. Violations of state laws do not by themselves state a claim under 42 U.S.C. § 1983. Ebmeier, 70 F.3d at 1013. The allegation that a state constitution itself operates to violate a plaintiff's federal civil rights may, in the proper circumstances, state a claim under 42 U.S.C. § 1983. See Byrd v. Sexton, 277 F.2d 418, 424 (8th Cir.), cert. denied, 364 U.S. 818 (1960). Here, however, plaintiff does not claim that Article I, § 21 is unconstitutional, rather, he asserts that it has been violated. Thus, this is a matter of state law and plaintiff fails to state a claim under Section 1983. See Byrd, 277 F.2d at 424.

## V. Conclusion.

For the foregoing reasons, the Court will deny plaintiff's motion for summary judgment and grant in part and deny in part defendants' motion for summary judgment. Defendants' summary judgment motion will be granted as to the following of plaintiff's claims: (1) the due process claims

---

[9]Article I, § 21 of the Missouri Constitution of 1945 states, "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

in Count I to the extent that plaintiff sought to have the Policy declared unconstitutional, which was asserted against defendants Schriro, Kempker, Grimes and Morrow; plaintiff's challenge to the disciplinary proceedings resulting from his positive urine tests; and plaintiff's claims that state law violations constitute due process violations; (2) the Fourth Amendment claim in Count II that target urinalysis testing is per se unconstitutional, which was asserted against defendants Schriro, Kempker, Grimes and Morrow; (3) the Fourth Amendment privacy claims in Count II; (4) the Eighth Amendment claims in Count III; and (5) all claims for emotional distress damages. Because the Court has concluded that the Policy is constitutional, and plaintiff's claims against defendants Schriro, Kempker, Grimes and Morrow were based solely on their actions in creating and implementing the Policy, these defendants will be dismissed from the action.

Remaining for trial are plaintiff's claims (1) in Count I that defendants Stubblefield, Daniels, Sampson, Cain and Carter harassed and retaliated against him for complaining about being targeted for urinalysis testing and for filing the instant lawsuit; and (2) in Count II that defendants Stubblefield, Daniels, Sampson, Cain and Carter unconstitutionally targeted plaintiff for urinalysis testing.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**; said motion is **GRANTED** with respect to the following claims: (1) the due process claims in Count I to the extent that plaintiff sought to have the Policy declared unconstitutional, plaintiff's due process challenge to the disciplinary proceedings, and plaintiff's claims that violations of state law constitute due process violations; (2) the Fourth Amendment claim in Count II that target urinalysis testing is per se unconstitutional; (3) the Fourth Amendment privacy claims in Count II; (4) the Eighth Amendment claims in Count III; (5) all claims under Article 1, § 21

of the Missouri Constitution; and (6) all claims for emotional distress damages; said motion is **DENIED** in all other respects.  [Doc. 115]

**IT IS FURTHER ORDERED** that plaintiff Jackie Walker's motion for summary judgment on Counts I and II is **DENIED**.  [Doc. 117]

**IT IS FINALLY ORDERED** that the Clerk of the Court will change the caption of this case to reflect the caption shown on the First Amended Complaint:  <u>Jackie Walker v. Gary B. Kemper, Dora Schriro, I. Grimes, Bonita Morrow, Gene Stubblefield, Cameron Daniels, Joe Sampson, Joe Carter, Mark Cain, and Michael Blandford, defendants</u>.

An appropriate partial judgment will accompany this memorandum and order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  _31st_  day of May, 2005.